CAREY *et al. v.* HOUSTON & T. C. RY. Co. *et al.*

(*Circuit Court, E. D. Texas.* March, 1891.)

1. RAILROAD COMPANIES—INSOLVENCY—RIGHTS OF STOCKHOLDERS.
   An insolvent railroad company had issued several series of mortgage bonds, some of which mortgages covered all of its property, and others only part. The principal of some of the mortgages was due, and the company had defaulted on the interest on all of them. In addition, it had a large floating debt, running into millions. There was no fair possibility of its being able to pay the accrued interest on the bonds and the floating debt without a sale of all its properties. *Held,* that a decree foreclosing all the mortgages, entered by consent of the creditors, would not be set aside at the suit of some of the stockholders on the ground that the principal of some of the mortgages was not yet due, as it was to the interest of the railroad company that the rights of all the mortgage bondholders should be cut off to enable the company to effect a reorganization which would secure and extend its bonded debt, and reduce the rate of interest thereon, and provide the necessary means to satisfy the floating debt.

2. SAME—REORGANIZATION—INJUNCTION.
   A proposed reorganization of the company, to be effected in connection with the foreclosure sale, by which the bonded indebtedness is refunded on longer time and at reduced interest, and which allows each stockholder to retain his stock on the payment of his *pro rata* share of the floating debt, is not a fraud on the stockholders, and will not be enjoined at the suit of some of them, who do not suggest any other method by which the financial embarrassments of the company can be met.

In Equity.

Bill by S. W. Carey and others against the Houston & Texas Central Railway and others. Complainant alleged that they were stockholders in defendant railroad company, and that the latter had issued several series of bonds, secured by distinct mortgages on its property. Some of these mortgages covered all its property, and some only part. Most of the bonds were owned by the Farmers' Loan & Trust Company and by the Southern Development Company, in which C. P. Huntington was a large stockholder, and by the Southern Pacific Railroad Company, of which Huntington is vice-president. The bill further alleged:

"(5) That in none of the said several mortgages is it provided that the failure to pay interest upon any of the bonds shall be taken to precipitate the maturity of the principal, nor do they provide for or permit the sale of the said railway prior to the maturity of the principal of the bonds referred to in the said respective mortgages, or either of them.

"(6) That the main line first mortgage, upon which said bill No. 198 was founded and based, provided by its terms that, if default be made in the payment of interest which should become due upon the said bonds, the trustees, at the request of any bondholder, were required to make a demand in writing

on the president or secretary of the company for the payment of interest in arrears, and, if the company made default for sixty days after said time, the trustees were empowered to take possession of the road, and use, operate, and work the same, and, after paying the expenses of running and operating the road and for needful and necessary repairs, apply the net profits to the payment and discharge of the interest, when and whereupon the said railway, with its appurtenances, was to be surrendered and delivered back to the said railway company; and it was further provided that, if default be made in the principal at maturity, the trustees should proceed to sell the lands which were conveyed and which remained unsold, and, if the proceeds of such sale should not be sufficient to pay off the said bonds and interest in full, then the trustees were directed, at the end of six months from the time of the maturity of the bonds, to sell the road to the highest bidder at public auction; to which mortgage, referred to in the decree hereinafter mentioned, complainants beg leave to refer, and make part hereof. The western division first mortgage, upon which said Easton and Rintoul filed their bill No. 199, contains provisions substantially similar in all respects. The general mortgage, executed April 1, 1881, embraced in said consolidated cause, contains substantially similar provisions. The mortgages known as the 'main line and western division consolidated mortgage,' and 'Waco & Northwestern division consolidated mortgage,' provide that in case the company failed to pay the principal or the interest upon bonds as they become due, and for sixty days after demand, the trustees were empowered to enter upon the road, operate and manage the same, and, after paying taxes and counsel fees, and necessary expenses in connection with the operation of the road, and for proper repairs, apply the surplus to the payment of interest or principal due, and assume the management of the road until the principal and interest are paid, or the property sold, as provided in the mortgage; but such sale was to be had only in case default should be made in the principal sum of the bonds at maturity, and proper proceedings were commenced to procure a decree of sale of said premises and property, which proceedings the trustees were required to commence at the request in writing of a majority of the holders of the bonds so in default.

"(7) Complainants further allege that the answer of the railroad company in said suits expressly placed in issue, by denying, that the principal sum of the said bonds had become due or demandable, and averred that the court was not authorized to set aside the terms and provisions of the deed of trust, and decree the principal of the bonds issued under the said deed to be due, when the same were not due until years after the filing of the bill, and that the court had no power to decree that the railways belonging to the said Houston & Texas Central Railway Company should be sold prior to the maturity of the bonds, or sold prior to the sale of all the lands covered by the said deeds of trust; and in the answer it was further averred that if the lands received by grants from the state of Texas were carefully administered and converted into money at a reasonable price by the railroad company, or by the receivers, the proceeds of the sale would so materially reduce the indebtedness of the company that it might reasonably hope to be able to pay the whole of its floating debt and the principal of its bonds upon the dates they become due.

"(8) Complainants further aver, on information and belief, that after the filing of the said answer, and until after the making of the reorganization agreement hereinafter referred to, no testimony was taken in the said suit. That while the suit was in that condition, and on or about December 27, 1887, an agreement was entered into, as complainants have since learned, by a majority of the holders of the mortgage bonds [with the possible exception of those upon the Waco & Northwestern division, as to which division a suffi-

cient number of bondholders could not be brought into an agreement for reorganization] and the Southern Pacific Co. and the Central Trust Co., for the reorganization of the said Houston & Texas Central Railway Company, by the terms of which agreement a plan of reorganization was agreed upon between the parties to said instrument, by which they agreed to a foreclosure of the said mortgages, and by which it was further agreed that a new company should be organized, which shall acquire all the property and franchises of the present company designated herein as the 'Houston & Texas Central Ry. Co. No. 1,' and thereafter issue new bonds, equal in amount to the principal of the outstanding consolidated mortgage and general mortgage bonds, in the following proportions: the present holders of the first mortgage bonds were to receive new bonds in equal amount, and, in addition, to be paid the face value, without interest, of the unpaid coupons, up to and including the coupons maturing July 1, 1887, and also a bonus of fifty dollars in cash upon each bond. The interest upon the said bonds was to be guarantied by the Southern Pacific Company. The holders of the consolidated mortgage bonds were to receive new bonds, with interest at the rate of six per cent., and, in addition, to receive debenture bonds, with interest payable semi-annually at the rate of six per cent., for three-fourths of the face value, without interest, of the unpaid coupons, to and including those maturing October 1, 1887; both the principal and interest of the said debenture bonds to be guarantied by the Southern Pacific Company. The holders of the general mortgage bonds, including nine hundred and forty-five bonds alleged to have been hypothecated with the Southern Development Company, Morgan's Louisiana & Texas Railroad Steam-Ship Company, and the National City Bank, to receive new bonds, bearing four per cent. interest, and, in addition, to receive debenture bonds bearing interest for two-thirds of the face value, without interest, of the unpaid coupons, to and including the coupons maturing October 1, 1887; both the principal and interest of the debenture bonds to be guarantied by the Southern Pacific Company, and the interest upon the general mortgage bonds was also to be guarantied by the Southern Pacific Company, and the new company was to issue stock in the sum of ten million dollars. That, though none of the stockholders of the company No. 1 as such were parties to the said agreement, it was, in and by the said agreement or plan of reorganization, provided that the present holders of the capital stock of the said Houston & Texas Central Railway might, within a time to be prescribed by the Central Trust Company, receive, if they elect so to do, a share of the capital stock of the new company equal in proportion to the stock held by the said stockholders, on paying a proportionate amount of the sums necessary to discharge the whole floating debt of the old company, and the cash payments to be made under the said plan for interest and bonus, and the necessary charges and expenses to be incurred in the said reorganization. That in said agreement it was further provided that in the event that any portion of the capital stock should not be taken up by the said stockholders, or holders of the floating debt, as provided in said agreement, then the Southern Pacific Company, on paying only the cash necessary to pay the interest and bonus to the holders of the first mortgage bonds and coupons, and other charges and expenses to be incurred in the said reorganization, were to be entitled to the capital stock of the new company not so taken up. That the said Central Trust Company was agreed upon as the purchasing trustee, with whom the bonds were to be deposited, and who was authorized to bid in and pay for the road on foreclosure, and to carry out the proposed reorganization, a copy of which plan of reorganization is on file with the clerk of this court, and to which reference is hereby made. That the negotiations in reference to the said plan of reorganization were had mainly, as complainants have since learned, with the said Huntington, and many meetings to arrange the same

were held at his office, as complainants allege, upon information and belief; but, as hereinfore stated, none of the stockholders of said company No. 1, as such, were parties to the said agreement, were notified of or in any manner agreed or consented to the same.

"(9) After the execution of the said agreement, or plan for reorganization by the said bondholders, and in pursuance thereof, and of the scheme mapped out, the complainants in said consolidated cause, during the May term of 1888 of this court, applied for, and, on consent, procured to be entered, a decree in the said consolidated cause, as complainants learned on examination of said record. That the only testimony in the cause were certain formal depositions of the trustees and others on behalf of the complainants, taken after the making of said reorganization agreement, as complainants are informed and believe, to which depositions, on file with the clerk of this court, complainants beg leave to refer. That, as appears from the docket of the clerk, the depositions were filed May 3, 1888, and publication made May 4, 1888, though the cause is purported to have been submitted on May 3d, and the decree, which consisted of about one hundred and fifty folios, filed and entered May 4th, to which docket complainants beg leave to refer: but no testimony was taken or submitted on behalf of the defendants in said suit, or to sustain the defenses interposed in the answer, nor any evidence offered by the complainants, or submitted to the court, rebutting the defenses which were raised and presented by the pleadings."

On the foreclosure sale the entire property of the railway company was purchased by Frederic P. Olcott. Complainants alleged that the decree of foreclosure was void, and that it was procured by the fraud and collusion of Huntington and his associates and the officers of the Houston & Texas Central Railway Company, and is a part of a scheme to acquire possession of said railway in the interest of Huntington and the Southern Pacific Company. The bill then proceeds:

"(11) Complainants have since learned and allege that, on acquiring the possession of the said railway under the said foreclosure sale, said Huntington and his associates caused to be filed articles of incorporation under the laws of the state of Texas, organizing and incorporating a railway company known as the 'Houston & Texas Central Railroad Company,' (which is herein designated as No. 2,) taking almost the same title and name as the corporation of which the complainants are stockholders, for the purpose of operating the said railway and its franchise, claimed by them to have been purchased and acquired at the said foreclosure sale; and thereupon, and on or about the 1st of September, 1889, issued a notice to the stockholders of the said Houston & Texas Central Railway Company, (No. 1,) including these complainants, that they could participate in and become entitled to an equal number of shares of the Houston & Texas Central Railroad Company (No. 2) as may be held by them in company No. 1, provided they pay an assessment of seventy-three dollars upon each share of stock held by them. That said assessment was wrongfully and fraudulently contrived and made up by said Huntington and his associates as a part of their scheme and plan for obtaining possession of the said Houston & Texas Central Railway, and that said assessment was not fixed and determined by the Central Trust Company, who alone and exclusively was authorized by said articles of reorganization to fix and determine said amount; and no assessment has been fixed or determined by said Central Trust Company at any time, nor is the floating indebtedness of the company No. 1 correctly stated, but the same is much less than is alleged by said Huntington and his associates. That said assessment is an attempt to compel the stockholders of company No. 1 to turn over their stock to said Huntington

and his associates, and to purchase from said Huntington and his associates stock in the new company."

Complainants prayed that the decree of foreclosure be set aside, and that defendants be enjoined from carrying out the plan of reorganization, and from issuing any stock or bonds of the Houston & Texas Central Railroad Company, (No. 2.) Defendants denied all allegations of fraud, and alleged that the decree of foreclosure was valid, and that the proposed plan of reorganization had been entered into in good faith.

*R. H. Landale, Clark, Dyer & Bollinger,* and *Jeff Chandler,* for complainants.

*Farrar, Jonas & Kruttschnitt, Butler, Stillman & Hubbard,* and *A. H. Joline,* for defendants.

PARDEE, J. This cause has been submitted upon motion for an injunction *pendente lite.* I have considered the bill, exhibits, affidavits, and arguments submitted, and refuse the injunction *pendente lite* for, among others, the following reasons:

1. On the showing made the charges in the bill of collusion and fraud to the prejudice of the company and stockholders are groundless; in fact the contrary appears, to-wit: That in the proceedings sought to be reviewed the interests of the defendant company and its stockholders were considered and protected to a degree beyond just legal demands, and, by the decree complained of and the reorganization agreement referred to in the bill, the stockholders are placed upon a better footing than would have resulted from the strict enforcement of the bondholders' mortgage rights.

2. Defects and informalities charged in the bill as existing in the proceedings and decrees sought to be reviewed, if considered as well taken, do not, in my opinion, render the decree void,—at worst, only voidable, —and do not prejudice or injure the complainants to any such extent as would warrant granting the relief prayed for in the bill. From the showing made in the original case and on this hearing the Houston & Texas Central Railway Company had been, and long prior to the decree complained of was, insolvent. It had defaulted for years in the payment of its interest. At no time for years had it in any one year earned its fixed charges. It had exhausted its borrowing capacity. It had a large floating debt, running into the millions, and there was no reasonable hope nor fair possibility of its being able to pay its accrued interest and conceded floating debt without a sale of all its properties, so as to permit of a reorganization, which would secure and extend its bonded debt, and reduce the rate of interest thereon, and provide the necessary means to pay off or satisfy its floating debt. Whether or not the principal of the debts represented by the several issues of mortgage bonds was due, it seems that the several bills for foreclosure allege such principal to be due, and it was to the interest of the company and all parties concerned that it should be declared due, so that on foreclosure sale and reorganization a lower rate of interest could be obtained, and means provided for the floating debt.

3. The principal, as well as the interest, on the issue of bonds known as the "Income and Indemnity Bonds" was due.    Interest was overdue on all the issues of bonds, and floating indebtedness to the amount of several million dollars was due.    A foreclosure for the principal and interest of the income and indemnity bonds, or for the interest alone on any of the other issues, would have extinguished the rights of the company, as there was no possibility of its raising the large sums necessary to prevent a sale.    A forced sale of the lands would have impaired the already insufficient security held by the creditors, without in any wise benefiting the company.    Some of the mortgages covered all of the property, others covering only parts.    Under these circumstances it was absolutely necessary, in order to prevent further confusion and complications and to save each set of creditors all their legal and equitable rights, to decree foreclosures for the entire debt, principal and interest, of each issue of bonds.    Any other decree not cutting off the rights of some of the mortgage bondholders would have been impracticable.    As the creditors were agreed as to the decree rendered, and as the company was not injured thereby, the stockholders ought not to complain.

4. The now complaining stockholders made no offer to provide for the large sums of interest, amounting to millions of dollars, conceded to be due, nor to pay the costs in executing the decree complained of.    Their bill sets forth no reason why such offer is not made, nor any inability on the part of the complainants (except as can be inferred from the large amounts involved) to provide for the conceded exigible indebtedness, Their bill neither shows nor suggests any methods or means by which the financial embarrassments of the company can be met in case complainants obtain the relief sought in their bill; and it seems to me, after a consideration of the whole case, that to grant complainants the relief they seek would not benefit them, but would unnecessarily injure and oppress the mortgage and other creditors of the company with the final result of more complications,—more indebtedness,—all to be finally settled by an absolute sale of all the property of the defendant company.

The arrangement provided by the reorganization agreement seems to have been the best possible for all the creditors of the defendant company; also the best for the company and the stockholders,—best for the stockholders, as it provides for refunding the bonded debt on longer time, at a reduced rate of interest, and allows each stockholder to retain his stock and his interest in the company, its railway and lands, upon paying his pro rata share of the floating indebtedness and the expense of the reorganization.    A foreclosure and sale for the payment of interest would have closed out all the interest of the stockholders in the company. This result has been avoided by the reorganization.    Without payment of the floating indebtedness, the stockholders could not hope to retain any interest in the company, and this floating indebtedness is practically all that they are required to pay.    To this it may be added that, if any of the stockholders think the agreement is not beneficial, they need not accept it; and then, in my opinion, they are in no worse position than they would have been if foreclosure had been had for the mortgage in-

terest conceded to be due. If any stockholder does accept the provisions of the reorganization agreement, of course, in a proper suit, he can enforce, if necessary, the carrying out of the provisions of the agreement, and protect himself and the company from the allowance of fictitious or fraudulent floating debt.