CASE 11—ACTION BY W. D. REED AND OTHERS AGAINST A. L. SCHMIDT AND OTHERS TO BE RECOGNIZED AS MEMBERS OF THE SYNDICATE PURCHASING THE CUMBERLAND & OHIO RAILROAD AT FORECLOSURE SALE.—MARCH 5.

# Reed and Others v. Schmidt and Others.

APPEAL FROM SHELBY CIRCUIT COURT.

JUDGMENT FOR DEFENDANTS AND PLAINTIFFS APPEAL. REVERSED.

RAILROADS—MORTGAGES—BONDS—FORECLOSURE SALE—BONDHOLDERS—ORGANIZATION OF POOL TO PURCHASE ROAD—RIGHT TO MEMBERSHIP—EQUAL EQUITIES.

Held:   1. Prior to the foreclosure sale of a railroad certain of the bondholders took steps to form a pool to buy the property at the sale, an agreement by which the bondholders signing the same appointed an agent to purchase the property and agreed to advance a sum in cash proportionate to their holdings of bonds being circulated among the bondholders. Plaintiff bondholders asked to sign the agreement, and were told to leave their bonds with a certain person, who would sign for them. Plaintiffs did so, and this person signed his name to the agreement as the owner of twelve bonds, nine of which were plaintiffs'; all of the bonds being signed for in the agent's name, P. B. Reed, as an organizer of the pool objected to plaintiffs becoming members thereof because of personal antipathy. This person, on learning that the agent's signature included plaintiffs' bonds, insisted upon the subscription being canceled, which was done, against plaintiffs' protest. HELD that, when the pool agreement was signed by plaintiffs' agent, they became members of the pool, and the subsequent withdrawal of their names did not affect their rights.

2. Under Kentucky Statutes, section 771, providing that upon judicial sale of any railroad the purchaser shall pay in cash, except

that, if the property be purchased by the holders of securities issued by the company, the purchaser shall be required to pay only such amount as the court may deem sufficient to insure compliance with the bid, and the purchaser shall therefore be entitled to pay the bid by payment of money or surrender of securities in proportion as such securities shall be entitled to receive the purchase money, and that all holders of the same class of securities shall be entitled to have equal rights in such purchases, all holders of railroad bonds are entitled to membership in a pool organized among the bondholders to purchase the property at foreclosure sale.

3. Where holders of railroad mortgage bonds are improperly excluded from a pool organized by bondholders to purchase the property at foreclosure sale, they are entitled, after the property has been sold by the pool to third parties, to an accounting, and to their proportionate share of the proceeds of the transaction.

W. W. THUM, FOR APPELLANTS.

J. C. BECKHAM & SON, OF COUNSEL.

POINTS AND AUTHORITIES.

1. By contract, these appellants became and remained parties to the pooling agreement. A. L. Schmidt had actual authority to go around and get signatures and to have the bonds subscribed. He not only had the apparent authority, but he had the actual authority. He had no secret instruction against the appellants, but even if he had, nevertheless, those instructions not being communicated to the appellants and their bonds being signed in, the contract was closed between them and the other signers and could not be dissolved without their consent. Bank of Newberry v. St. Clair, 60 N. H., 101; U. S., etc. Co. v. Board, 18 Ky. Law Rep., 948; South Pac. v. Duncan, 16 Ky. Law Rep., 119; Phoenix, etc., v. Thomas, 10 Ky. Law Rep., 254; Greenly v. Brooks, 13 Ky. Law Rep., 207-298; Hill v. Nat. Trust Co., 100 Pa. St., 1; James v. Crossthwaithe, 36 L. R. A., 631; Schimmelpenich v. Bayard, 1 Peters, 263; Russ v. Telfener, 57 Fed., 937; Gano v. Finnell, 13 B. M., 390; Megibben v. Showne, 9 Ky. Law Rep., 358; 2 Herman on Estoppel, sec. 908; Hayes v. Caulfield, 5 Queen's Bench, 81; McMullen v. Richie, 64 Fed., 973; Glidden & Jay v. Interstate Bank, 69 Fed., 942; Catholic Bishop v. Troup, 61 Ill., App., 641; Allen v. Sykes, 5 J. J. M., 614; Morrison v. Taylor, 6 Mon., 85; Herman on Estoppel, 765, 767, 794, 906.

P. B. Reed could neither scratch out his own bonds, nor the bonds of others after the parties had signed, and the attempted change and erasure did not alter the contract.

Reed and Others v. Schmidt and Others.

"Equity will protect and enforce an agreement of the purchaser at the foreclosure sale to allow other holders of securities to participate with him in the purchase." Gardner v. Utica Railroad, 61 Howard, 184 (1881); Pa. Trans. Co. appeal, 101 Pa. St., 576 (1882); Gage v. St. Louis R. R. Co., 99 U. S., 334; Jackson v. Ludeling, 21 Wall., 616.

2. P. B. Reed intimates in his deposition that the figure "12" including the nine bonds of these appellants was written surreptitiously, with the knowledge of these appellants and J. W. Nichols; that he, P. B. Reed, objected to these appellants being in the pool. That this can not be true is shown by the fact that J. W. Nichols made it his business on March 11, 1900, at five o'clock, to come to notify the appellants that P. B. Reed objected to their being in the pool and that he proposed next mornin to scratch out the "12" and write "3" in place thereof, which does not look as though the appellants already knew of his objection. Moreover, there is a letter dated March 11, 1900, marked "Exhibit E" (see Record, page ——) attached to the batch of plaintiffs' depositions showing that Nichols was himself notified by Booker Reed after the signature of plaintiffs' bond in the pool that he, Booker Reed, opposed their being there. W. D. Reed shows in his deposition, Record, page ——, that he told A. L. Schmidt that Nichols would sign their names to the pooling agreement, and to go up to Nichols' bank, which Schmidt did. This same letter of Nichols, see Record, page ——, marked "Exhibit E," states that the signature of the plaintiffs' bonds was made "J. W. Nichols and F. N. Lewis, 12," at the suggestion of A. L. Schmidt and that A. L. Schmidt knew that it also contained the bonds of the three Reed brothers, appellants. No one can read the deposition of A. L. Schmidt, who is completely under the domination of P. B. Reed, without being convinced that this statement is absolutely true. Notwithstanding Schmidt shifts very considerably in his answer, he does not actually deny that he had a pretty good knowledge of the matter, and it is shown in evidence that this statement was made in his presence by Nichols and that he did not deny it, and strongly removes the idea of their being included surreptitiously on the part of the three Reed brothers, appellants, or on the part of J. W. Nichols, their agent, to sign in their bonds. If there was anything surreptitious, it was on his own part, though he undertakes to say that, "There never was any distinct understanding that the Reed plaintiffs were not to be admitted into the pool, though P. Booker Reed had expressed his objection to it to me." Thus, this agent admits that he had no instructions not to include the bond of the Reeds, appellants. He further

Reed and Others v. Schmidt and Others.

shows in his testimony that the pooling agreement contained the entire contract.

3. A. L. Schmidt had been for years and was then the trustee for the bondholders. Unquestionably, any pool which he forms to buy the road is one in which his beneficiaries can be admitted. A trustee can not act contrary to the interests of the *cestui que trusts* about a matter concerning his trusts as intimately and directly as this. Cook on Corporations, sec. 885; also concerning the duties of trustees, see People v. Township Board, 11 Mich., 222; Tisdale v. Same, 2 Snead, 596, 64 Am. Dec., 775.

4. Such pooling agreements to purchase railroads are favored by the courts. Where a bondholder or stockholder has applied to come into the reorganization, as such steps are called, and has complied with the requirements laid down in the form, he may insist upon being admitted, unless he has been guilty of laches. Cook on Corporations, sec. 888, and notes.

This is apart from any contract. Cook on Corporations, sec. 881, *et seq;* Marie v. Garrison, 83 N. Y., page 114 (1880); Kennedy v. McCloskey, 170 Pa. St., 354, (1895); Kelly v. Browning, 21 Southern, 928, (Ala., 1826); Benedict v. Moore, 76 Fed., 472, (1896); Hill's Waterfall Co., (1896), 1 Chy., 947; 3 Cook on Corporations, chapter on Purchase and Reorganization, p. 521, sec. 883 to 890; Dester v. Ross, 85 Mich., 370 (1891); Cook on Corp., 883; Turbell v. Lee, 40 Fed., p. 40, (1889); Cary v. Huston, 45 Fed., 438, (1891); Cook on Corp., sec. 886 and note 2; Bound v. South Carolina R. R., 78 Fed., p. 54; Cook on Corp., sec. 888, and note 2; Jackson v. Ludeling, 21 Wall., 616.

5. These appellants have been guilty of no laches and have tendered their portion of charges, expenses and purchase price, and are entitled, under section 771, Kentucky Statutes, to be adjudged purchasers at the sale at Shelbyville, March 12th.

In this case the consolidated record has been taken up on appeal. It is a case wherein we believe the court will be aided by an oral argument so as to point out those portions of the record most relevant. These appellants, under absolute contract rights, and under equitable principles, and under the practice of courts with respect to the sale of railroads, both by virtue of statute and in States where no statute exists, are entitled to be adjudged purchasers and part owners of the road bought under the pooling agreement.

We respectfully submit herewith a brief filed on final submission in the lower court.

WILLIS & WILLIS, ATTORNEYS FOR APPELLEES.

This appeal is an echo of the old Northern Division of the Cumberland & Ohio Railroad Company's litigation, which has

been in the courts of this State for twenty years. It has been in this court seven or eight times, and in the United States Supreme Court twice.

This time it is here, not so much for any value at stake, or any great or vital principle involved, but because of an intensely bitter personal hostility existing between members of the same family who were bondholders of the old Northern Division of the Cumberland & Ohio. It does appear to us that the real, the primary motive of this action was not to secure or to enforce any valuable rights or privileges, but in some way to continue a bitter, unforgiving fight, between the members of this family. Of all the immense record before the court not more than one hundred pages of it, evidence and pleading, are competent or relevant to the question in issue. Of the very numerous authorities cited by the appellant's industrious and zealous counsel, there is not one of them with which we desire to make any issue, and although we will quote and comment upon some authorities, later in this brief, in our judgment, the whole case turns on a question, not of law, but a pure simple question of fact.

## STATEMENT OF FACTS.

In the old case of Schmidt v. Germania Safety Vault and Trust Company, opinion by Judge DuRelle, filed September 21, 1899, the judgment of the Shelby circuit court, directing the sale of all the property of the Northern Division of the Cumberland & Ohio Railroad, was affirmed.

In pursuance to this judgment the property was advertised for sale at the court house door in Shelbyville, Kentucky, on the 12th day of March, 1900. The upset price fixed by the court was $25,000 and the purchaser was required, under the judgment to pay in cash as much as $2,500.

Certain bondholders, in an effort to protect their interest, formed a "pool" in reality, a partnership agreement, for a joint venture. These bonds were of $1,000 each. There were 250 of them, and a very large amount of interest accumulated on them, in fact the interest due on these bonds was almost as much as the principal. One hundred and seventy-three of these bonds (excluding appellants or 182 including appellants), went into the pool or partnership agreement. Each member of the pool or partner in the joint venture paying in, in cash, twenty dollars on each bond to create a fund, to pay expenses, and make cash payment required on day of sale. P. B. Reed was chosen to do the bidding and represent the parties to the agreement. On the day of sale a bid of $25,000 was made by Mr. L. C. Willis, representing certain clients. P. B. Reed, under the agreement above mentioned bid $25,001 and the property was

sold to him. He, for himself, and his associates, paid in cash the $2,500 cash payment required, executed the bonds and has complied with all the terms of the sale and all orders of court.

It was then appellants claimed they were also purchasers, or members of the "pool" or partners with appellees in the joint venture. Appellees denied this. In this manner arose this action. In our judgment it presents a pure question of fact, viz.: Were or not appellants members of the "pool" or partners in this undertaking or joint venture?

On this point we desire to make some suggestions. P. B. Reed, in all the years of litigation about this property had been the dominant and leading spirit. In the long and costly litigation between the weak and almost impoverished bondholders upon one side and the Louisville & Nashville Railroad Company, he had given largely of his owns means and by his own efforts raised large sums of money by contributions and assessments from others. He had been persistent and untiring in his contest for the benefit of these bondholders. They appreciated it, and when a combination or pool was to be formed to protect themselves, and reap, if possible, some benefit from their long and bitter contest, it was to him the bondholders turned for advice and leadership, and to him they adhered most loyally when this controversy arose. It was, therefore, agreed that Mr. Reed, Mr. Schmidt and Mr. McCarty should take the lead and get up, organize this joint venture or partnership or "pool" and formulate a plan of action.

Some time before this a very serious disagreement over other business matters had arisen between P. B. Reed and the appellants. They did not speak. Both sides refused to have any relations with the other whatever, in business or social or family communication. This record shows them to be equally good fighters and good haters. The appellants had very shortly before March 12th become owners of three bonds each. (It is contended by appellees, and the record bears them out that none of the appellants had ever given money, time or attention to this contest or to the matters of business involved, and had taken no interest in this matter, personally, until a day or two before the day fixed for the sale.) When the formation of the "pool" was first taken into consideration, the leading and dominant person connected with it, viz., P. B. Reed, in the most positive and absolute manner announced to his associates and those that it was proposed should become his associates in the venture, that under no circumstances would he permit, if he was in the agreement, the appellants to become parties to it, and if they became parties to it, that he would withdraw entirely from it, and either have nothing to do with the purchase

of the road, or he would get up a new "pool" or combination. It appears that all of his associates and every man who became a party to the agreement, except the appellants, recognized his wish about it and agreed to abide by his desire.

A partnership is but a contract; it is but an agreement between the parties. And it can not be claimed that there ever was a contract between these appellants and appellees, or between these appellants and P. B. Reed, who was managing the matter for the remainder. For, neither P. B. Reed or any of his associates had ever agreed to accept appellants as partners, or as associates in this business transaction. Therefore, they immediately repudiated it, and early Sunday morning, demanded of Nichols, who had signed the agreement for twelve bonds, when he only owned three, that he erase from the agreement, and withdraw from the pool, nine of these bonds, because he only owned three, and had neither right nor equity in an effort to control more than three.

Under these circumstances, fully understanding the bitter hostility that P. B. Reed held toward them, that P. B. Reed was the controlling and dominant spirit in the pool or joint venture, and the person selected or to be selected by those in the pool to bid for them, and represent them in the matter; did not want them in the pool and would draw out if they were permitted to go into the pool, and that the other members of the pool sympathized with and sustained him in his contention; they attempted to become members of the pool in this manner.

J. W. Nichols owned some bonds, a man by the name of Lewis controlled some, or some interest therein; together, they had three bonds.

Now, by some arrangement Nichols and Lewis put into the pool twelve bonds, in their joint names; nine more than they had. Three of which were their own and nine of which were the bonds of the appellants.

Now, the court will notice that, according to the agreement there were $180 due the pool on these nine bonds. All of the other members of the pool gave their checks to the pooling committee, but appellants did not do this; they gave their check to Nichols.

It is contended by appellants that Nichols had no right to withdraw the bonds. To us that is a strange contention. He had signed the pooling agreement, not as agent, or as attorney for any one; he had signed it for himself, and had signed it for nine bonds that he did not own; the proposition was false on its face, and Mr. Nichols recognized it, and having thus signed, he had the right, and it was his duty, as an honorable man, dealing honorably with his associates, to withdraw from the agreement

bonds that he did not own, and that he had no right to put in the pool as belonging to him. The whole matter simplified is, if he had a right to go into the pool, under his own name, without notice to his associates of any agency, he had the right to take them out, and this he cheerfully and clearly did, early on the morning of the 12th, having on the afternoon of the 11th, given appellants notice that he would do so.

The court will notice that Nichols had given his own check for twenty dollars for each of the twelve bonds, or $240. And when he withdrew the bonds, so completely was the nine withdrawn, that he received back his check for $240, and gave in lieu thereof his check for sixty dollars, the amount due on his three bonds; notified appellants that he would do so; that he would erase the figures "12" and put in lieu thereof the figure "3," and very early on the morning of the 12th, did so, and hours before the sale notified appellants that he had done so.

Under these circumstances, we can not see how it could be contended, even at that time, that appellants were members of the pool. They never were members of the pool. They never were partners of the people who formed the pool; they never signed the agreement; they never had any one to sign it, as their agent. They never paid any money into the pool. The only thing that was done, Nichols signed for twelve bonds instead of three. But, if they had been members of the pool, up to that time, the person who had signed the bonds in his own name, in the same manner and in the most perfect good faith, and with full notice to everybody, withdrew them.

This was the condition of affairs when the sale was made. Two of the appellants attended the sale. They claimed that they made some mention to some one at the time of the sale that they claimed to be in the pool. But all the persons who were active in the matter emphatically deny this.

The future conduct of appellants was such that if they had ever been members of the pool, the court would be justified, as the court below was, in holding them estopped to claim any interest in it.

We have again looked at the authorities quoted by counsel for appellants. And after a re-examination of them, we are still forced to the conclusion which we held in the argument of this case before the court, that there is none of the authorities with which we desire to take serious conflict; none of them, where a principle is decided, with which we make any issue. They, as well as all other authorities we have been able to find, hold to one proposition, and that is, Were or not appellants members of the pool?

We again insist there is no question of law involved in this

case. It is only a question of fact, and of *one* fact, and that is, were appellants, at the time of the sale, members of the association of partnership, or pool, or combination which bought the property, through its or their representative, P. B. Reed? The other fact of their estoppel, by their subsequent conduct being only pertinent, if the court should be of the opinion that they ever were members.

In conclusion, we beg to suggest that this record shows that all of these parties in this hotly contested litigation about temporary injunctions and motions to set aside and exceptions to report of sale, and motions to modify the injunction, and motions to appoint the receiver, were very frequently before the court. The court below knew these parties. Saw their demeanor, caught and understood the purpose of this litigation, and it being a question of fact only, the judgment of the chancellor should carry great weight, especially in this case.

We therefore, earnestly ask an affirmance.

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

The Cumberland & Ohio Railroad Company (Northern Division) issued bonds in 1879 to the amount of $250,000, and executed a mortgage on its railroad and franchises, etc., to Joshua F. Speed, trustee, to secure their payment and interest. After the death of Speed, appellee A. L. Schmidt was substituted, under the provisions of the mortgage, as trustee for the bondholders. The Cumberland & Ohio Railroad Company (N. D.), contemporaneously with the execution of the mortgage named, entered into a contract with the Louisville, Cincinnati & Lexington Railroad Company, by which the latter leased the properties of the former for a term of 30 years, agreeing to provide, out of the rentals and otherwise, a sinking fund for the payment of the mortgage debt and interest. This lease and contract were assigned by the Louisville, Cincinnati & Lexington Railroad Company to the Louisville & Nashville Railroad Company. Default was made for several years in the payment of interest coupons by the Cumberland & Ohio Railroad Company (N. D.), and a suit was brought in the cir-

cuit court of Shelby county by certain bondholders to enforce the mortgage lien. The result was a decree for the sale of the railroad property and franchises free of all liens. This sale came on to be made by the court's commissioner on the 12th day of March, 1900. The trustee under the provisions of the mortgage, A. L. Schmidt, had been engaged in numerous and extensive litigations for about 12 years on behalf of the bondholders against the Louisville & Nashville Railroad Company and others. It appeared at times as if the lessor road was bankrupt, and that it could pay little or nothing on its bonded indebtedness. This was so evident that the bonds depreciated in market value till they had become practically unsalable. During that time the trustee had called upon bondholders for funds to enable him to prosecute and defend the various suits affecting their lien. Certain ones, including Mrs. Jane M. Reed, Miss E. T. Reed, and those whose names appeared upon the reorganization pool contract hereinafter named, contributed as called upon, enabling the trustee to make the contests leading up to, if not bringing about, the condition of the decretal sale on March 12, 1900. Before that time, however, both Mrs. Jane M. Reed and Miss Reed had died, and the bonds previously owned by them had been distributed to their devisees and heirs, and had been sold at executor's sales, so that on and before March 10, 1900, appellants W. D. Reed, J. D. Reed, and S. S. Reed (who were sons of Mrs. Jane M. Reed, and brothers of Miss E. T. Reed) became the owners, each of three of those bonds, of the denomination of $1,000 each. That for which the bondholders had been waging a wearisome fight for and against for many years was come to its final test. Upon its issue depended whether they would receive anything, and, if anything, what amount, to reimburse them for their

original and subsequent investments. It was understood among those who had been conducting and backing this matter that the only tangible method of protecting their interests finally was to form a purchasing syndicate of bondholders, who could and would by co-operation and conjoint effort either buy in the road at the sale, and by its operation and resale make themselves whole on their investments, or by their bidding force another to pay for it such a price that the bondholders would receive upon their debts against the road its full value at the time of the sale. In view of the character of the property, it was not probable that any one of the bondholders could or would feel justified in alone buying the property, or that he could even become an acceptable bidder thereon. It is customary, indeed, it may be said that it is nearly always necessary, that some such arrangement be made and allowed, or the sales of such properties at auction would be impracticable. The parties A. L. Schmidt and others agreed to organize such a buying pool in this instance. P. Booker Reed, a brother of appellants, appears to have been one of the prime movers in this enterprise. He was a bondholder to the extent of 26½ bonds. An agreement was prepared upon the following form, and industriously circulated among the bondholders for their agreement to its terms, and for their signatures: "This writing witnesseth, that whereas, the Cumberland & Ohio Railroad (Northern Division), with all its property, rights, etc., is about to be sold under decree of the Shelby circuit court, in action of Germania Safety Vault & Trust Company, assignee, etc., against said railroad company, enforcing the lien under a mortgage made for the benefit of the holders of bonds of said road: Now, in order to protect our interests in the premises, we, the undersigned holders of the bonds of said road, do hereby consti-

tute and appoint —— as our agent, and as such do hereby authorize and empower them at any sale of said railroad under aforesaid decree to bid on said railroad and property, and buy it in for us at a price not exceeding —— dollars, and each of us to be bound only for our pro rata of the price, to be ascertained by our proportion of the bonds held by the undersigned; and we will also pay a like pro rata of like costs or expenses of said agent incurred in perfecting this transaction; and, as the terms of sale require a cash deposit of $2,500.00 by the purchaser, each of us agree to put into the hands of said agent twenty dollars per bond held by us, to be applied for that purpose, or so much thereof as may be necessary." P. Booker Reed and A. L. Schmidt were the principal actors in soliciting these subscriptions. Appellants received notice through Schmidt of the plan to form the syndicate. They at once took steps to avail themselves of the privilege, and say that they applied to Schmidt to be permitted to sign the paper, and were by him told to leave their bonds with J. W. Nichols, of the Southern National Bank; that he could sign for them. Appellants accordingly left their nine bonds with Nichols, and paid to him $180 ($20 a share upon each bond), as required by the pooling agreement. Nichols then, on the following day, March 10, 1900, signed the agreement thus: "J. W. Nichols and F. N. Lewis, 12" (meaning that Nichols and Lewis represented and subscribed 12 of the bonds of the issue to form the pool). As a matter of fact, Nichols and Lewis owned but three of the bonds, the other nine being owned by appellants. It is claimed that the paper was signed in this manner at the instance of A. L. Schmidt, because P. Booker Reed had violently opposed appellants' being admitted into the syndicate. That appellants authorized an adequate subscription by Nichols, and paid the

assessment required by the pooling contract, is not denied, nor is it that Nichols intended to subscribe for them, and on their behalf, to the extent of nine bonds, in making the subscription that he did. On Sunday evening, March 11, 1900, P. Booker Reed learned that Nichols' subscription represented appellants' bonds. He at once became violently angry and indignant, and in a most dictatorial manner required of Nichols that appellants' subscription should be revoked, or "scratched off," under threat that he would withdraw from the syndicate, and form another. All of this was because of a family quarrel between P. Booker Reed and his brothers, the appellants, and entirely disconnected, it seems, from the merits of this suit. Nichols thereupon, late that Sunday evening, informed appellants that he would, on the following morning, because of their brother's violent hostility and threats, cancel the subscription made by him. Appellants promptly and emphatically forbade his doing or attempting to do anything of the kind, expressly informing him that the extent of his agency for them in the matter was to subscribe for them to the proposition, and not to revoke a subscription which they had authorized. They followed this up with formal written notices to the same effect to P. Booker Reed and other principal promoters of the purchasing syndicate, including Nichols, which were delivered late Sunday night. The sale was the following day at about 11 o'clock a. m., at Shelbyville, some 25 miles from Louisville. Schmidt and the Reeds and the most numerous of the others signing the agreement resided at Louisville when the occurrence first stated had taken place. To get to Shelbyville in time for the sale it was necessary to leave Louisville about 7 o'clock in the morning. At about 7:45 o' clock of Monday morning, March 12, 1900, Nichols, at the instance of P. Booker Reed, and in the pres-

ence of appellee Schmidt, and with the concurrence of others of appellees (but not in the presence of appellants), erased the word "12" from his subscription, and wrote "3" in its stead, and received from P. Booker Reed his check covering the payment of $180, above alluded to, and which was on the next day tendered to appellants, but rejected. At the sale P. Booker Reed, as agent for the syndicate of bondholders, parties to the agreement, bought in the railroad property for $25,001. At once appellants begun steps to have themselves recognized as members of the syndicate by intervening in the foreclosure suit. The sale was approved, and the report confirmed. Appellants offered to pay into court any further assessment necessary under the pooling arrangement to finish paying for the property and expenses incident to the purchase, etc. All of this was bitterly resisted by P. Booker Reed on behalf of the syndicate. On final hearing the circuit court dismissed appellants' intervening petition; hence this appeal.

Appellees seem to state their case upon the proposition that one has the right to select his partners, and, at any rate, that a court of equity will not compel one to enter into an unwilling copartnership with others in whom he has not confidence, and with whom his personal relations are such as to make their co-operation impossible. It is not necessary to gainsay either proposition, if it could be done. But it seems to us that the situation of these parties is far beyond the point assumed by appellees. Have they not already embarked into a joint enterprise, in one sense in the nature of a partnership, by which the rights of appellants have attached, and can not now be ignored or destroyed by the others? This is true, in our opinion, whether we come to the conclusion that appellants became parties to the pooling arrangement by the act of Nichols, their

agent, or whether it be rested upon an earlier right of possible equal dignity; that is, their rights, as members of a class of bondholders, having equal equities against the property, and against whose interest the trustee and a majority of the bondholders of the same .class had no right to discriminate. It seems to be assumed that P. Booker Reed, as one of the moving spirits of this scheme, had the legal right to control the matter of whom should be let into it; and that, if his personal dislike or hostility was sufficient cause for him, or even if without cause, he might reject any applicant from membership into the syndicate, no matter what his equities. But this is an erroneous assumption. It undertakes to settle these property questions upon the basis of personal feeling, instead of legal rights. These bonds for years helped to bear the burden of the common fight for the benefit of all. Their owners contributed from time to time, certainly with the clearly implied, if not expressed, understanding that they were to share, or at least be offered an opportunity to share, in the result. When the pooling agreement was signed by Nichols as agent for appellants, with the assent of Schmidt, they became members in fact. P. Booker Reed had not the right to require their names to be withdrawn, nor had Nichols the right to withdraw them. Independent of their contract right as members of the syndicate, appellants, as holders of a part of these bonds, were beneficiaries of all reasonable efforts by their trustee to realize the very best results. Appellee Schmidt, known by all his associates to be trustee for all the bondholders under the mortgage, could not create a pool for buying in the mortgaged property at the least possible price for the exclusive benefit of a favored and chosen number of the bondholders, himself included.

All should have been afforded a fair opportunity to share on equal terms. A purposeful failure to offer, or denial of, such privilege was a fraud upon the excluded bondhold- ers. Cook on Corp., sec. 888; Jackson v. Ludeling, 21 Wall., 616, 22 L. Ed., 492; Wetmore v. R. R., 1 McCrary, 467, 3 Fed., 177; Cox v. Stokes (N. Y.), 51 N. E., 320.

From the enormities of the properties involved, and of the sums necessary to buy them in at decretal or foreclosure sales, the courts have favored combinations of those inter- ested in the property as bondholders or stockholders, or- ganized to buy in the properties, for the reason that by this means only are bidders assured, and the best interests of those having claims upon the property protected. Terbell v. Lee (C. C.), 40 Fed., 40; Carey v. Railway Co. (C. C.), 45 Fed., 438; Cook on Corp., sec. 886, and authorities there cited. But the courts have borne in mind all the time the rights and interests of all who are so interested, and they have not allowed some to use this privilege of the law to oppress the weaker of those holding equal equities. Jenkins v. Frink, 30 Cal., 594, 89 Am. Dec., 134; Cox v. Stokes, supra. This has given rise to legislative cognizance of the subject. In this State, since 1896, a somewhat elaborate and careful plan for the reorganization of insolvent rail- road companies sold out under foreclosure or insolvency proceedings has been provided by section 771, Ky. St., and its various subsections. Unless a reorganization plan is first submitted to and approved by the court decreeing the sale of the corporate properties, it is provided: "At any such sale, or at any sale which shall be hereafter made, of any railroad or bridge under any decree of sale, the pur- chaser or purchasers shall be required to pay the amount of the bid in cash: provided, however, that if the property shall be purchased by or in behalf of holders of any class

of securities issued by the said company, the purchaser or purchasers shall be required to pay in money or securities, immediately, such amount only as the court may deem sufficient to provide against a non-compliance with the bid; and the purchaser or purchasers shall thereafter be entitled, within such time as may be fixed by the court, to pay the amount of the bid by the payment of such money as may be necessary, and by the surrender of securities in proportion as such securities shall be entitled to receive the purchase money; and all holders of the same class of securities shall be entitled to have and enjoy equal rights in any such purchases with other holders of the same class." We are of opinion that under this section, even without a previous agreement with the members of the pool, appellants, if offering within a reasonable time to bear their proportion of the expenses and assessments necessary to carry the sale into effect, were entitled to join in the purchase, and to share the profits. Having made such offer before the confirmation of the sale, and repeated it before the property was conveyed to the corporation formed by the syndicate, appellants should have been admitted.

It is suggested in the record that the property has since been sold, and passed into the hands of independent owners. If appellants had been admitted as members of the syndicate, it would necessarily have been upon terms that they abide the judgment of the authorities of the corporation organized by the membership to own and operate the property And if this corporation has in fact and in good faith sold the property and conveyed it, appellants are entitled to an accounting, after deducting what they would have been compelled to pay into the pool, on the basis charged other members, and interest thereon from the time same should have been paid, and those necessary costs and expenses in-

curred in perfecting the enterprise and making the sale. The net proceeds should be then distributed upon the basis of the total number of shares of stock in the pool, including appellants'.

Judgment reversed, and cause remanded for judgment and proceedings consistent with this opinion.